1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA, )
                              )
5                             )
     -VS-                     ) DOCKET NO. 1:18-CR-00487-SCJ-JFK-1
6                             )
    EMANUEL GRAY,             )
7                             )
            DEFENDANT.        )
8

9          TRANSCRIPT OF SUPPRESSION MOTION PROCEEDINGS
            BEFORE THE HONORABLE JANET F. KING
10             UNITED STATES MAGISTRATE JUDGE
                 MONDAY, APRIL 29, 2019
11

12

13

14

15

APPEARANCES:
16

ON BEHALF OF THE GOVERNMENT:
17        JOLEE PORTER, ESQ.,
          ASSISTANT UNITED STATES ATTORNEY
18

19  ON BEHALF OF THE DEFENDANT:

20        VICTORIA MARIE CALVERT, ESQ.

21

22

              PENNY PRITTY COUDRIET, RMR, CRR
23               OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT
24                  ATLANTA, GEORGIA

25

1                              I N D E X

2    WITNESS:                                              PAGE:

3    MEGAN PERRY

4         DIRECT EXAMINATION                                 3
          CROSS-EXAMINATION                                 21
5         REDIRECT EXAMINATION                              35
          RECROSS-EXAMINATION                               36
6
                              - - - - -
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        (APRIL 29, 2019)

 2            (PROCEEDINGS HELD IN OPEN COURT AT 9:39 A.M.)

 3            THE COURT:  This is the case of United States of America

 4    versus Emanuel Gray, 1:18-CR-487.  Ms. Porter is here for the

 5    Government.  And Ms. Calvert is here seated with her client.  We

 6    are here on a motion to suppress statements, Document 20.

 7            Ms. Porter, are you ready to proceed?

 8            MS. PORTER:  Yes, your Honor.

 9            THE COURT:  You may call your first witness.

10            MS. CALVERT:  Your Honor, the Government will call

11    Special Agent Megan Perry as our only witness today.

12            (Witness duly sworn)

13            COURTROOM DEPUTY CLERK:  Please state your name and

14    spell your last name for the record.

15            THE WITNESS:  Megan Perry, M-E-G-A-N, P-E-R-R-Y.

16            COURTROOM DEPUTY CLERK:  Thank you.

17            _____

18                          MEGAN PERRY

19            a witness herein, being first duly sworn,

20              was examined and testified as follows:

21                       DIRECT EXAMINATION

22    BY MS. PORTER:

23    Q.  Agent Perry, where do you work?

24    A.  I work for the FBI.

25    Q.  What is your position?
```

1  A.  I'm a special agent.

2  Q.  How long have you been a special agent with the FBI?

3  A.  Since August of 2014.

4  Q.  What are your responsibilities?

5  A.  I am assigned to the violent crimes against children squad.

6  Q.  Are you familiar with an investigation involving Emanuel Gray?

7  A.  I am.

8  Q.  Did you encounter him on November 14th, 2018?

9  A.  Yes.

10  Q.  Where was that encounter?

11  A.  At his residence, 1005 Crest Lane in Decatur, Georgia.

12  Q.  Is that a house or an apartment?

13  A.  An apartment.

14  Q.  Why did you go to that apartment that day?

15  A.  We were executing a search warrant at that apartment that day.

16  Q.  Can you explain the typical procedure that the FBI uses for

17  executing a search warrant.

18  A.  Yes.  We have a group of individuals, it's all law enforcement

19  personnel, a mix of agents or local police departments or task

20  force officers.  And we are outfitted in police gear, so we'll

21  have a vest that either says "police" or "law enforcement" or

22  "FBI" on it.  And we have a group of individuals that go to the

23  front door and some that are on the perimeter or the exterior of a

24  house or residence.

25          And we approach the door, we knock, we say we're law

1  enforcement, we're there for a search warrant, and we wait a

2  reasonable amount of time to see if someone will answer the door.

3  Q.  And if someone answers the door, what's the typical procedure?

4  A.  We ask them to exit the house and a law enforcement personnel

5  will stand with that individual outside of the residence.

6  Q.  What happens next?

7  A.  And depending on the residence, we'll either stand in the

8  doorway and call for other individuals to come out if we know

9  there's more people in the house.  And if no one comes out, we

10  enter the house and took what we call clear, a law enforcement

11  clear, just to make sure any occupants are out of the house for

12  everybody's safety.

13  Q.  And was that standard protocol followed on November 11th,

14  2018?

15  A.  It was.

16  Q.  Can you explain what happened that day.

17  A.  We -- when we were at the door of the residence, right when we

18  knocked on the door, someone was actually opening the door on the

19  other side.  It was a female.  And so she exited the apartment

20  and actually left the apartment complex.  But we stood in the

21  doorway and called for folks to come out of the house.  And no one

22  came, so the team started to make entry.

23          As people were coming out of the house, they were

24  escorted outside the house and held in the hallway of the

25  apartment outside of the apartment complex.

1  Q.  When you say "held in the hallway," can you explain what that

2  means.

3  A.  Just standing there with law enforcement personnel to make

4  sure they didn't enter back into the apartment while we were

5  trying to render it safe.

6  Q.  Why could they not re-enter the apartment at that time?

7  A.  Because we're trying to clear out all the individuals from the

8  house for everybody's safety and make sure there's no weapons or

9  individuals in there that could cause harm to themselves or to us.

10 Q.  Could the individuals standing in the hallway that exited the

11 home, could they have left at that point in time like the woman

12 who initially exited?

13 A.  While we were clearing the house, we like to keep them there.

14 But, yeah, when we're executing the search warrant, they're free

15 to go.

16 Q.  About how many agents were there executing the search warrant

17 with you that day?

18 A.  About ten, it was a combination of agents, task force officers

19 and local police department.

20 Q.  Was everyone at the front door of the apartment?

21 A.  No.  Approximately six were at the front door and then we had

22 a couple people at the back of the apartment.  And then our

23 supervisor usually is not part of the entry team.

24 Q.  Were you and the other agents armed that day?

25 A.  Yes.

1  Q.  And when you initially -- when the door was initially knocked

2  on -- did you knock on the door?

3  A.  I did not.

4  Q.  Did another agent?

5  A.  Yes.

6  Q.  Were guns drawn at that point?

7  A.  Yes.

8  Q.  Were guns reholstered after individuals came out of the home?

9  A.  Yes.  The individual, the agents who stand with the

10 individuals, they always holster their weapons.

11 Q.  Do you recall when and where Mr. Gray was first encountered,

12 Emanuel Gray?

13 A.  He was one of the four occupants that exited the house and was

14 held or stood in the hallway of the apartment complex outside of

15 the apartment.

16 Q.  And is he with us in the courtroom today?

17 A.  Yes.

18 Q.  Is he sitting at defense table?

19 A.  Yes.

20 Q.  What happened after the house was cleared?

21 A.  Once the house was cleared, we assigned two law enforcement

22 personnel to interview each of the residents, each of the

23 occupants of the house.

24 Q.  And who was assigned to interview Mr. Gray?

25 A.  Myself and Special Agent Keith Kabrhel.

1  Q.  Can you explain how that interview was initiated.

2  A.  I had approached Mr. Gray outside of the apartment and said

3  that we wanted to talk to him, we had some questions for him if

4  he's willing to talk to us, that he didn't have to if he didn't

5  want to.  And he agreed to talk to us.

6  Q.  From the time that agents first encountered Mr. Gray until

7  that interview, did anyone threaten him or make any promises?

8  A.  No.

9  Q.  Did anyone put him in handcuffs?

10  A.  No.

11  Q.  Did anyone physically restrain him?

12  A.  No.

13  Q.  Was any physical force exerted on him?

14  A.  No.

15  Q.  Did anyone point a gun at him?

16  A.  No.

17  Q.  After you asked Mr. Gray if he was willing to have the

18  interview with you, what happened next?

19  A.  We went into an FBI vehicle because it was raining out.  And

20  that was the best place that we could sit and talk to him.

21  Q.  You mentioned there were other individuals that day who were

22  interviewed.  Where were their interviews conducted?

23  A.  Each one in a separate vehicle, FBI vehicle.

24  Q.  Do you know how much time passed between the initial entrance

25  in the house and the beginning of the interview with Mr. Gray?

```
 1  A.  Approximately 30 minutes.

 2  Q.  What time did you guys initially enter the house

 3  approximately?

 4  A.  About 7:30 a.m.

 5  Q.  What time did the interview start?

 6  A.  At 8:04 a.m.

 7  Q.  And you mentioned that you and another agent interviewed

 8  Mr. Gray.  Who was the other agent?

 9  A.  Special Agent Keith Kabrhel.

10  Q.  Whose car did you conduct the interview in?

11  A.  Special Agent Brian Clarity.

12  Q.  Was that a marked patrol vehicle?

13  A.  No.

14  Q.  So can you explain what happened next as far as getting into

15  that vehicle?

16  A.  Yeah.  The vehicle was parked right in the front of the exit

17  of the apartment complex or the apartment building they lived in,

18  so we walked to the apartment and we all entered the vehicle.

19  Keith Kabrhel sat in the front driver's seat, I sat directly

20  behind him in the back seat driver's side and Emanuel Gray was

21  sitting in the back seat passenger side.

22  Q.  Was it still raining at this time?

23  A.  It was.

24  Q.  Was a search being conducted inside of the apartment also?

25  A.  That's correct.
```

1 Q.  While you were all in the car was anything restraining

2 Mr. Gray?

3 A.  No.

4 Q.  Were the doors locking him into the car?

5 A.  No.

6 Q.  Did he have a seat belt on?

7 A.  No.

8 Q.  Was the car stationary?

9 A.  Yes.

10 Q.  So he wouldn't have needed a seat belt?

11 A.  Correct.

12 Q.  Did he have the ability to leave the car at any time?

13 A.  Yes.

14 Q.  Was there anything blocking him from leaving the car?

15 A.  No.

16 Q.  I assume y'all were seated or were you standing?

17 A.  We were seated in the vehicle.

18 Q.  Did you or the other agent in the vehicle have your firearms

19 drawn during the interview?

20 A.  No.

21 Q.  Were you both armed still?

22 A.  We were.

23 Q.  Were your firearms visible?

24 A.  No.

25 Q.  Did you record that interview?

1  A.  Yes.

2        MS. PORTER:  Your Honor, permission to approach?

3        THE COURT:  You don't have to ask.

4  BY MS. PORTER:

5  Q.  I'm showing you what's been marked as Government Exhibit 1 for

6  identification purposes.  What is that?

7  A.  This is the disk containing the audio recording of the

8  interview with Emanuel Gray.

9  Q.  How do you know what's on that disk?

10 A.  I listened to it this morning and I put my initials on the

11 disk.

12 Q.  Is that a true and correct recording of the interview you

13 conducted?

14 A.  Yes.

15       MS. PORTER:  Your Honor, at this time I seek to admit

16 the audio recording as Government Exhibit 1.

17       MS. CALVERT:  No objection.

18       THE COURT:  Admitted.

19 BY MS. PORTER:

20 Q.  At the beginning of the recorded interview did you tell

21 Mr. Gray whether or not he was under arrest?

22 A.  I told him he was not under arrest.

23 Q.  And on the recording, the recording has -- I guess there are

24 two voices, correct?

25 A.  Correct.

1  Q.  Is one -- whose voices are those?

2  A.  There's myself, Keith Kabrhel and Emanuel Gray, so the three

3  of us will be on the recording.

4  Q.  So three voices.  And a female -- if it's a female voice, is

5  that your voice?

6  A.  That's correct.

7  Q.  There's a statement:  I mentioned this out there, I asked if

8  you wanted to talk to us and you said you did.  What did that

9  mean?

10  A.  I was just stating on the recording that I had asked him if he

11  would be willing to talk to us and that he didn't have to if he

12  didn't want to.  And he said he would be willing to answer our

13  questions.

14  Q.  Did you tell him he was free to go?

15  A.  I did.

16  Q.  And that's recorded?

17  A.  Correct.

18  Q.  Did you tell him he was not under arrest?

19  A.  I did.

20  Q.  And that's recorded?

21  A.  Correct.

22  Q.  Did you tell him the interview was voluntary?

23  A.  I did.

24  Q.  And that's recorded?

25  A.  Correct.

1  Q.   Did you give him a Miranda warning?

2  A.   I did not.

3  Q.   Why not?

4  A.   Because he was not under arrest, he wasn't in custody at the

5  beginning of the interview.

6  Q.   At the beginning of the interview did you know whether or not

7  he was going to be arrested that day?

8  A.   No.

9  Q.   During the interview did you later remind him again that he

10  didn't have to answer your questions?

11  A.   I did.

12  Q.   Did you later remind him again that he was not under arrest?

13  A.   Yes.

14  Q.   During the interview did he sign a consent to assume on-line

15  identity authorization form?

16  A.   He did.

17  Q.   I'm showing you what's been marked as Government's Exhibit 2.

18  What is this?

19  A.   This is an FBI consent form that we use to take over on-line

20  accounts of individuals, so they give us consent and provide us

21  the account name and password and then we assume the ownership of

22  the account from there on.

23  Q.   What is the date on this form?

24  A.   November 14th, 2018.

25  Q.   Is your signature on this form?

1  A.  It is.

2  Q.  Is Mr. Gray's signature on this form?

3  A.  Yes.

4  Q.  Is this a true and correct copy of the consent to assume

5  on-line identity authorization form that you and Mr. Gray signed

6  on November 14th, 2018?

7  A.  Yes.

8          MS. PORTER:  Your Honor, at this time I seek to admit

9  this as Government's Exhibit 2.

10          THE COURT:  What does this have to do with the motion to

11  suppress?

12          MS. PORTER:  This just has additional language about

13  voluntary authorization of providing consent to search these

14  items, just further emphasizing that the interaction was voluntary

15  that day.

16          THE COURT:  Ms. Calvert?

17          MS. CALVERT:  No objection.

18          THE COURT:  All right.  Admitted.

19          MS. PORTER:  And I'll be brief with this document, your

20  Honor.

21  BY MS. PORTER:

22  Q.  Does this document discuss whether or not he's providing

23  consent freely and voluntarily?

24  A.  Yes.

25  Q.  Those are all my questions about that document.

1          What happened -- do you recall about what time the

2    interview concluded?

3    A.   Approximately 9:15 a.m.

4    Q.   A.M.?

5    A.   A.M.

6    Q.   What happened next?

7    A.   We exited the vehicle and went back inside the residence to

8    see --

9          THE COURT:   "We"?  Who "we"?

10         THE WITNESS:   Emanuel Gray, Keith Kabrhel and myself

11   exited the vehicle and went back in the house.

12   Q.   Did you or Special Agent Kabrhel tell Mr. Gray he had to enter

13   the house with you?

14   A.   No.

15   Q.   Was it still raining outside?

16   A.   Yes.

17   Q.   Once you were inside of the apartment, did you and Mr. Gray

18   have any further discussion?

19   A.   We did.  During his interview he had told us that he had some

20   images on his cell phone in a hidden gallery.  And when we went

21   inside, we had gotten his phone and he showed us how to find those

22   images and unhide the images in the gallery.

23   Q.   During the recorded interview, did he give you the password to

24   his phone?

25   A.   He did.

1  Q.  Did you record that discussion once you were back inside of

2  the apartment where he told you how to unhide the pictures?

3  A.  I did not.

4  Q.  Why didn't you?

5  A.  I wasn't asking him anything in addition, we were just going

6  over the information that he had already provided in the recorded

7  interview.

8  Q.  Was he free to move around at this point or leave at this

9  point in the apartment?

10 A.  When they're in the apartment, we ask them to stay in the

11 living room, but if they wanted to move around, they just needed

12 to ask us.  They couldn't freely move around within the apartment

13 while the search was being conducted.

14 Q.  Did --

15 A.  But they could leave at any time if they wanted to leave the

16 apartment.

17 Q.  So if he had asked to leave, what would have happened?

18 A.  He could have left.

19 Q.  Approximately how long was the recorded interview?

20 A.  Approximately an hour and ten minutes.

21 Q.  The recorded interview?  You said before it started at

22 8:04 a.m.?

23 A.  Correct.

24 Q.  And you said before it ended at 9:15 a.m.?

25 A.  Correct.

1  Q.  Okay.  Approximately how long did you speak with him inside
2  the apartment after the recorded interview?
3  A.  Just a minute or two, just enough where we had gotten into the
4  phone and he showed us the gallery.
5  Q.  At any point from your initial encounter with Mr. Gray to the
6  end of that conversation where he's showing you the pictures on
7  the gallery in the living room were any threats or promises made
8  to Mr. Gray?
9  A.  No.
10  Q.  Did you or any other agents point a gun at him?
11  A.  No.
12  Q.  Was he ever placed in handcuffs during that time period?
13  A.  No.
14  Q.  Was he physically restrained during that time period?
15  A.  No.
16  Q.  During that period was he told he couldn't leave?
17  A.  No.
18  Q.  During that period was he told he was under arrest or that he
19  had to talk to you?
20  A.  No.
21  Q.  During that period was any physical force exerted on him?
22  A.  No.
23  Q.  During that period did you touch Mr. Gray?
24  A.  No.
25  Q.  Did Agent Kabrhel touch Mr. Gray?

1  A.  No.

2  Q.  What was the tone of your conversation with Mr. Gray?

3  A.  Calm.

4  Q.  Were there raised voices or yelling?

5  A.  No.

6  Q.  Did he express any feelings of duress?

7  A.  No.

8  Q.  Did he appear to be under the influence of alcohol or drugs?

9  A.  No.

10  Q.  In fact, did you ask him if he was under the influence of

11  alcohol or drugs?

12  A.  Yes.

13  Q.  What did he say?

14  A.  No.

15  Q.  Was his speech slurred?

16  A.  No.

17  Q.  Did he appear coherent?

18  A.  Yes.

19  Q.  Were his answers responsive to your questions?

20  A.  Yes.

21  Q.  Did he indicate whether or not he could read and write

22  English?

23  A.  He did.

24  Q.  Did he say that he could -- he could read and write English?

25  A.  Yes, he did.

1   Q.   Did he appear confused about what was going on?

2   A.   No.

3   Q.   Did he say he wanted to quit talking to you or cease the

4   interview?

5   A.   No.

6   Q.   Did he say that he wanted an attorney?

7   A.   No.

8   Q.   Did he say that he wanted to leave?

9   A.   No.

10  Q.   Did he say that he had to get to work or school that day?

11  A.   No.

12  Q.   Did he ask for food or drink?

13  A.   He did not.

14  Q.   Did he ask to use the restroom?

15  A.   He did not.

16  Q.   If he had asked for a break, food or drink or to use the

17  restroom, what would have happened?

18  A.   We would have gotten him whatever he needed or allowed him to

19  use the restroom.

20  Q.   During the interview were the windows ever rolled down in the

21  car?

22  A.   Yes.

23  Q.   Tell me about what happened.

24  A.   He was hot.  He had a jacket on, he took his jacket off and we

25  rolled down the window for a little while to let some air in.

1  Q.  Did he ever mention feeling ill during the interview?

2  A.  No.

3  Q.  Did he mention any physical health issues?

4  A.  No.

5  Q.  Or mental health issues?

6  A.  No.

7  Q.  Was Mr. Gray ever arrested that day?

8  A.  He was.

9  Q.  Tell me about what happened.

10 A.  Once we were previewing his phone, we found an image of -- a

11 nude image of the victim of the case.  And I called you as the

12 attorney on the case and to provide you the information of what we

13 had found so far in the search warrant to see if -- what our next

14 step should be.

15 Q.  Did you preview the phone at what point during that morning?

16 A.  After the interview, once he had shown us how to get into the

17 hidden gallery.

18 Q.  So after you saw the hidden gallery, then you previewed the

19 phone?

20 A.  Yes.

21 Q.  About how much time passed between the end of previewing the

22 gallery and then the arrest, about how much time passed?

23 A.  Approximately an hour.

24 Q.  And then what happened at the arrest?

25 A.  Once you authorized the arrest, we went inside and informed

1  him that he was going to be placed under arrest, informed his mom

2  he was going to be placed under arrest.  We searched him to make

3  sure that he had -- didn't have any items on him that he couldn't

4  have with him at the Marshals and he was placed in handcuffs and

5  transported to the US Marshals.

6  Q.  Did you all read him his Miranda rights at that point?

7  A.  Yes.

8          MS. PORTER:  No further questions, your Honor.

9          THE COURT:  Ms. Calvert.

10                      CROSS-EXAMINATION

11 BY MS. CALVERT:

12 Q.  Agent Perry, you arrived on November 14th to execute the

13 search warrant at 1005 Crest Lane, correct?

14 A.  That's correct.

15 Q.  And that is an apartment building, an apartment complex?

16 A.  That's correct.

17 Q.  And the apartment building itself is a two-story building?

18 A.  I believe it might be three stories.  I think it's on a hill.

19 I think there might be a lower level.

20 Q.  Mr. Gray's apartment was on the first level or street level?

21 A.  It was on -- yeah, the parking garage level -- or the parking

22 lot level.

23 Q.  So street level, is that like --

24 A.  Yeah.  There's a street behind it I think is a lower level, so

25 it just depends which way you're looking at it.  But I think the

1  back of their apartment wasn't at street level but the front was.

2  Q.   Okay.  And to get to Mr. Gray's apartment door, you needed to

3  go through a hallway or a breezeway, right?

4  A.   That's correct.

5  Q.   And that hallway is covered?

6  A.   Correct.

7  Q.   And prior to arriving at Mr. Gray's residence, you had

8  identified him as a suspect, right?

9  A.   We didn't know who it was.  The victim -- the person the

10  victim was talking to, they had told her that their name was

11  Emanuel.  Our research had found a couple different Emanuel Gray's

12  that were associated with that address, so we weren't sure for

13  sure who it was or who was using that identity or that cell phone.

14  Q.   But you at least knew that the victim had stated Emanuel Gray

15  was the name of the person she was talking to?

16  A.   She didn't ever know the last name I don't believe.

17  Q.   Okay, Emanuel, I'm sorry.

18  A.   Yeah.

19  Q.   In terms of the two Emanuels you found Mr. Gray who from his

20  license was 19 years old, right?

21  A.   Yes, he's one of the ones we found.

22  Q.   And then there was another Emanuel Gray who was probably I

23  think significantly older?

24  A.   Correct.

25  Q.   And you had Emanuel Gray's photograph, this Emanuel Gray?

```
 1  A.  Yes.
 2  Q.  And based on your research, you were aware that Mr. Gray had
 3  never been arrested before?
 4  A.  Yes, we did a criminal history.
 5  Q.  Now, on that morning approximately ten agents were there?
 6  A.  Yeah.
 7  Q.  And you also had DeKalb officers?
 8  A.  That's correct.
 9  Q.  And you stated that -- I'm not sure you did state.  You were
10  wearing a vest that identified you as law enforcement?
11  A.  That's correct.
12  Q.  Is that the same for everyone else who was present?
13  A.  Yeah, everybody had on a vest.  It might not have been the
14  same as mine, but everybody had on a vest that had some sort of --
15  whether it said law enforcement, police or FBI on it.
16  Q.  Was everyone, all the law enforcement officers armed?
17  A.  Yes.
18  Q.  And prior to arriving at the residence was there a plan to
19  interview everyone present?
20  A.  Yes.
21  Q.  What time did you arrive at the apartment?
22  A.  It was approximately 7:30 a.m.
23  Q.  Was it light outside?
24  A.  I believe so.  I don't recall exactly.
25  Q.  And you said that it was raining that morning?
```

1  A.  It was.

2  Q.  Was it raining throughout the entire time or just

3  intermittent?

4  A.  I can't say, I just remember it was raining.

5  Q.  Was it light rain, heavy rain?

6  A.  I don't know exactly.

7  Q.  Do you recall having an umbrella?

8  A.  I don't usually carry an umbrella.

9  Q.  Did you have on like a rain jacket?

10  A.  I wouldn't have wore a jacket over my vest at the time.

11  Q.  Now, you said that the procedure was to knock and announce,

12  and you did not do the announcing or the knocking?

13  A.  I don't believe I did either.

14  Q.  So were you all lined up in a stack to enter?

15  A.  That's correct.

16  Q.  And where were you?

17  A.  I was maybe third or fourth back.

18  Q.  So did you go into the residence to get Mr. Gray?

19  A.  I did not.

20  Q.  So someone else went in, got him and brought him to the --

21  A.  Yeah, I don't know who brought him out.

22  Q.  Okay.  But is that the first time that you saw Mr. Gray is

23  when he came out of the door or had you gone into the apartment?

24  A.  I had not gone into the apartment at all.

25  Q.  So the first time you saw him is when --

1  A.  Outside of the apartment.

2  Q.  Okay.  And what was he wearing?

3  A.  I don't recall.  I don't believe he had a shirt on.  I know he

4  had a jacket, I don't know if we got that after the fact or if he

5  had it on when he came out.

6  Q.  And do you recall that he was wearing shorts?

7  A.  I believe so.

8  Q.  And was the jacket actually on him or kind of thrown over his

9  shoulders?

10  A.  I don't know if his arms were in the arm holes of it or not.

11  I know when he had it on in the car, he had taken it off because

12  he was hot.  I don't know if his arms came out or if he just had

13  it over his shoulders.

14  Q.  And Mr. Gray came out and then he was kind of placed in the

15  hallway while law enforcement cleared the residence?

16  A.  That's correct.

17  Q.  And you stated that there were agents or officers standing by

18  him?

19  A.  That's correct.

20  Q.  Do you recall how many?

21  A.  I don't recall.  I wasn't standing over there by them.

22  Q.  And the other occupants in the residence, you said there were

23  three other people who came out in addition to Mr. Gray?

24  A.  That's correct.

25  Q.  That one was his mother, is that correct?

1  A.   That's correct.

2  Q.   And then I believe a cousin and a sister?

3  A.   Yeah, I don't know if it was -- or maybe both cousins.

4  Q.   And then did they actually -- did those people come out and

5  stand next to Mr. Gray or were they separated?

6  A.   No, they were not next to him, they were just right outside

7  the apartment door.

8  Q.   So he was a little further down from the apartment?

9  A.   Yeah.  Uh-huh (affirmative).

10 Q.   By himself?  With the officers I guess?

11 A.   Yeah.

12 Q.   At what point did you actually identify Mr. Gray?

13 A.   What do you mean by "identify"?

14 Q.   How did you know it was --

15 A.   We asked everybody their names at the time when we were

16 standing outside.

17 Q.   And how long were you outside in the hallway?

18 A.   I don't know exactly how long we stood out there.

19         THE COURT:  How long in the hallway at what point?

20         MS. CALVERT:  I guess while they were clearing or before

21 they went into the car, I'm not sure.

22         THE WITNESS:  I don't know.  I believe it was a

23 four-bedroom apartment.  I know they tried calling individuals out

24 for a little while before they even entered, but I don't know how

25 long it took them to clear the apartment exactly.

1  Q.  And you don't recall how long Mr. Gray was in the hallway

2  before y'all moved to the car?

3  A.  No.  I mean, we entered at approximately 7:30 a.m. and our

4  interview started at 8:04 a.m., so somewhere in that window.

5  Q.  And I think you stated that the agents decided to split up to

6  conduct interviews?

7  A.  Yes, that's correct.

8  Q.  And did -- well, you and Agent Kabrhel decided to interview

9  Mr. Gray?

10  A.  That's correct.

11  Q.  Did y'all talk about any strategy or how you were going to

12  approach the interview?

13  A.  No.

14  Q.  After the apartment was cleared, was Mr. Gray allowed to go

15  back inside?

16  A.  Yeah, anyone could have went inside, they just needed -- they

17  couldn't freely walk around inside, so they would need to be

18  escorted.

19  Q.  Were they told that they could go back inside?

20  A.  I don't know what everybody was told, I only interacted with

21  Mr. Gray.

22  Q.  Okay.  Well, what was Mr. Gray told?

23  A.  We asked him if he wanted to interview.  I don't -- going back

24  in didn't come up.

25  Q.  And the vehicle that Mr. Gray was interviewed in you stated

1  was not a marked vehicle?

2  A.  That's correct.

3  Q.  It didn't have like a partition like you would see in a police

4  car?

5  A.  No.

6  Q.  It was just a regular --

7  A.  Just a regular vehicle.

8  Q.  And Mr. Gray was not handcuffed?

9  A.  He was not.

10  Q.  Even for your safety?

11  A.  No.

12  Q.  Or Agent Kabrhel's safety because you were sitting next to

13  him?

14  A.  No.

15  Q.  And did you all just decide to bring -- well, I guess, how did

16  the conversation go with actually getting Mr. Gray into the

17  vehicle?

18  A.  I mean, we asked if he would be willing to talk to us.  He

19  said he would.  I think when we were deciding that -- where all --

20  everybody was going to be interviewed because we weren't sure how

21  many people were in the house in advance until we got there and

22  realized we needed four interview locations, the vehicle was the

23  easiest place.  That was private, not the hallway of an apartment

24  complex where people were coming and going.  And they were

25  conducting the search inside the apartment, so it just didn't have

1  enough space inside for everyone to be interviewed in there.

2           THE COURT:  I think she asked how did you express that

3  to Mr. Gray, what did you say to him?

4           THE WITNESS:  Oh.  I don't recall if we said that's

5  where we're going or if we just got in, I don't recall.

6  Q.  Is it fair to say that Mr. Gray was not in control of the

7  vehicle, right?

8  A.  He was not.

9  Q.  He could not drive it away?

10 A.  No.

11 Q.  And at some point he had actually asked for y'all to drive a

12 little further away and y'all said no, right?

13 A.  Correct.

14 Q.  Were there any other agents or officers around the car during

15 the interview of Mr. Gray?

16 A.  At one point an agent came out and knocked on the window of

17 the vehicle and we interacted with him.  People might have been

18 walking by but not just lingering outside the vehicle for any

19 reason.

20 Q.  Now, the recording that was admitted as Government Exhibit 1

21 references some earlier conversations that both you and Agent

22 Kabrhel had with Mr. Gray, right?

23 A.  That's correct.

24 Q.  Do you recall what was actually said to Mr. Gray?

25 A.  I know when I had said it, I was referencing that -- we had

```
 1  asked him his name just to establish the identities of the people
 2  in the house and that we asked him if he would be willing to talk
 3  to us.  I don't know the discussions that Agent Kabrhel and him
 4  had prior to.  I know on the recording Agent Kabrhel mentioned
 5  something like, as I told you, the FBI does things different, but
 6  I don't --
 7            THE COURT:  The FBI does what?
 8            THE WITNESS:  He said on the recording the FBI doesn't
 9  conduct things the same way as the local police department,
10  something in that regard, and I wasn't privy to that conversation.
11  Q.  So it sounds like there was a time when you were not with
12  Mr. Gray?
13  A.  That's correct.
14  Q.  How long were you not with him?
15  A.  While they were clearing the house I was standing with his
16  mother and the two cousins, so I was the one that was standing
17  with them just to make sure they didn't re-enter the apartment.
18  So I wasn't around him during the house clearing portion.
19  Q.  Was Agent Kabrhel around him during the house clearing
20  portion?
21  A.  I don't know who was standing with him at the time.
22  Q.  And other than that, was there a time prior to the interview
23  where you were not with Mr. Gray?
24  A.  No.
25  Q.  And after the interview, same thing, were you with him the
```

1  whole time?

2  A.  No.

3  Q.  Was Agent Kabrhel with him after?

4  A.  We went back in the apartment and he sat in the living room,

5  so there was various agents because they were still conducting the

6  search.

7  Q.  Were any of the other interviews conducted that morning

8  recorded?

9  A.  I believe so.

10  Q.  Did you have any information about Mr. Gray's education level?

11  A.  No.

12  Q.  Don't know how far he went in school?

13  A.  No.

14  Q.  Don't know whether he had any intellectual disabilities?

15  A.  No.

16  Q.  And I know that you stated that the victim had said that she

17  was talking to a person named Emanuel, so at the time of the

18  interview you thought there was only one victim, correct?

19  A.  That's correct.

20  Q.  But since then you've identified a second victim?

21  A.  That's correct.

22  Q.  And the first victim was -- is 14 years old, right?

23  A.  Currently?

24  Q.  Or at the time of the conduct.

25  A.  I believe they start communicating when she was 13 through

1  when she was 15.

2  Q.  And the second victim is older?

3  A.  Sixteen.

4  Q.  And during the interview Mr. Gray had stated that he thought

5  that the victim was 16 or 17, right?

6  A.  That's correct, at one point.  And then he clarified that

7  later that he -- she had actually said she was younger than that.

8  Q.  But it's not clear whether he was misremembering victims or

9  talking about the victim y'all were talking about?

10  A.  Yeah, that's fair.

11  Q.  But ultimately he did agree with you all that the victim was

12  younger?

13  A.  That's correct.  And he identified -- he recognized her name,

14  so we talked about her name.  So when he was talking about age, he

15  was associating it with the victim's name.

16  Q.  You stated Mr. Gray was free to go, right?

17  A.  Correct.

18  Q.  But he could not have gone back in the apartment, right?

19  A.  He could go back in the apartment, he couldn't freely walk

20  around the apartment.

21  Q.  Did you tell him he could go back in the apartment?

22  A.  We did go back into the apartment.

23  Q.  Was that at his suggestion?

24  A.  I don't know who suggested it but it -- that's where we went

25  after the interview.

1  Q.  And you never told Mr. Gray that he could have a lawyer with

2  him?

3  A.  No.

4  Q.  Did you tell him that his mother could be with him?

5  A.  No.

6  Q.  And you didn't tell him he had a right to remain silent?

7  A.  Not at the interview, no.

8  Q.  You stated the interview lasted an hour and 15 minutes?

9  A.  About an hour and ten minutes.

10 Q.  Hour and ten minutes.  So it would have been done

11 approximately 9:15?

12 A.  Correct.

13 Q.  And then Mr. Gray was placed under arrest at 10:20?

14 A.  That's correct.  We departed at 10:21 a.m.

15 Q.  And was it you and Agent Kabrhel who took him to the

16 courthouse?

17 A.  I believe it was Agent Brian Clarity.

18 Q.  Was it in Agent Clarity's car, the same vehicle?

19 A.  Correct.

20 Q.  So the same vehicle that the interview had been conducted?

21 A.  Uh-huh (affirmative).

22 Q.  So from 9:15 to 10:20 Mr. Gray was sitting in his living room?

23 A.  Yes.

24 Q.  You stated that he showed you the hidden folders on the phone?

25 A.  That's correct.

Q.   And how long did that take?

A.   I mean, I can't say exactly.  There's unlocking the phone,

clicking on the gallery.  I would say a minute or two max.

Q.   So for most of the -- most of the time he was just sitting

there not having any interactions with law enforcement?

A.   I was outside the apartment most of the time after that, so I

don't know who he interacted with inside the apartment.

Q.   And you are sure that Mr. Gray was not handcuffed while he was

in the car?

A.   He was not handcuffed while he was in the car.

Q.   Whether or not he was handcuffed or not is not something

that's reflected in the audio recording, right?

A.   No.

Q.   And the fact that y'all were in the car because of the rain is

not reflected in the audio?

A.   No.

Q.   Was Mr. Gray told if he needed to use the restroom, he could

just ask?

A.   I don't believe we specifically referenced using the restroom,

no.

Q.   Well, what was he told about his ability to move around?

A.   Just I told him he was free to go; if he wanted to go, he was

free to go.

Q.   Free to go where?

A.   He didn't have to be in the interview situation if he didn't

1  want to be.

2  Q.  Okay.  No, I meant like after -- or while he's in the

3  apartment, was he told he was free to go around, walk around?

4  A.  He was not free to walk around the apartment.

5            MS. CALVERT:  Your Honor, can I just have a moment?

6            THE COURT:  Sure.

7  Q.  Agent Perry, was anyone wearing any body cameras this morning,

8  during the morning of the search warrant?

9  A.  The FBI doesn't have body cameras.  There was a local police

10  officer there with us.  I don't recall -- I don't know if he was

11  using it or not.

12  Q.  But you're not aware of any footage of what was going on in

13  the apartment?

14  A.  No.  No.

15            MS. CALVERT:  Your Honor, one moment, please.

16            Nothing further, your Honor.  Thank you.

17            THE COURT:  Any redirect?

18            MS. PORTER:  Just short redirect.

19                       REDIRECT EXAMINATION

20  BY MS. PORTER:

21  Q.  Agent Perry, defense counsel asked and you said that you

22  didn't tell him he had the right to remain silent, but did you say

23  that he didn't have to talk to you?

24  A.  That's correct.

25  Q.  In the car while the audio recording was going, you mentioned

1  that he removed his jacket, is that correct?

2  A.  That's correct.

3  Q.  Could someone handcuffed either in the front or back remove

4  their own jacket?

5  A.  No.

6  Q.  And in the apartment you mentioned he was not free to walk

7  around the apartment but was he free to leave the apartment?

8  A.  Yes.

9  Q.  And if he had left the apartment, would he have been free to

10  walk around outside?

11  A.  Yes.

12          MS. PORTER:  Thank you.

13                    RECROSS-EXAMINATION

14  BY MS. CALVERT:

15  Q.  Two quick questions.

16          And, Agent Perry, if the jacket was just over the

17  shoulders, you could remove it while in handcuffs, just shrug it

18  off?

19  A.  Just shimmy it off, I guess.

20  Q.  Mr. Gray did not state he had a job to go to, right?

21  A.  No, I believe he was unemployed at the time.

22          MS. CALVERT:  Okay.  All right.  Thank you.

23          THE COURT:  You may step down.  Thank you, ma'am.  Make

24  sure that Ms. Thornton's got those exhibits.

25          (Witness excused)

1          THE COURT:  I believe you reported, Ms. Porter, that's

2    your only witness?

3          MS. PORTER:  Yes, your Honor.

4          THE COURT:  Evidence?

5          MS. CALVERT:  No, your Honor.

6          THE COURT:  Okay.  So I was thinking about this this

7    morning, about the transcript timing.  I have got to get this

8    submitted to me as early in June as possible because most of July

9    and mid-July I'm gone.  So I need -- I want at least a couple of

10   good weeks in June to work on this and get it done before I'm

11   leaving the country, okay?

12         So I guess we've got -- we need to work back from that

13   or -- and I don't want to duly delay it since Mr. Gray's in

14   custody but, you know, any extensions, we're going to have to bump

15   it big time.

16         MS. CALVERT:  And, your Honor, I actually was going to

17   ask for a little bit more time than normal because I have five

18   sentencings in May and a week absence and then a trial June 18th.

19   And I believe Ms. Porter does, too.

20         THE COURT:  Well, I'm just saying then the submission

21   has to be to me like July 19th, which I'm happy to give you all

22   the time, but I'm just saying I'm not getting back and I can't --

23   I'm not going to use up half -- I'm not going to use up weeks of

24   my 30 days when I'm not here and cannot work on it.  So I'm happy

25   to do whichever y'all want, get it rushed in or give you the time

1  because I want you to have the time that you need to do this,

2  especially if you may want a reply brief.

3          So you just tell me.  We can work back from the

4  submission date of July the 19th.

5          MS. PORTER:  When we discussed before, the July 19th

6  date sounds like it aligns exactly what Ms. Calvert and I were

7  discussing.

8          THE COURT:  So do you want that to include a reply brief

9  or -- tell me what dates y'all are looking at.

10          MS. CALVERT:  I think if we did two weeks for the

11  transcript and then 30 days for each of us to write our brief and

12  then a week for a reply, I think that would get us to right

13  around --

14          THE COURT:  All right.  The 14 business days for the

15  transcript, where does that put us?

16          MS. PORTER:  That's May 13th.

17          THE COURT:  So does that sound good?  Okay, for the

18  transcript.  On or around 6/13, what is that?

19          COURTROOM DEPUTY CLERK:  That is a workday.

20          MS. PORTER:  10th.

21          COURTROOM DEPUTY CLERK:  6/13.

22          MS. PORTER:  Thirty days.

23          COURTROOM DEPUTY CLERK:  Oh, okay.

24          MS. CALVERT:  I can do the 10th.

25          THE COURT:  You can do the 10th?

1          MS. CALVERT:  Yes, June 10th.

2          THE COURT:  6/10 for the defendant.

3          MS. PORTER:  Then 7/8.

4          THE COURT:  7/8 for the Government.  And then --

5          MS. PORTER:  7/15.

6          THE COURT:  Well, 7/19 for the reply brief.  I wanted it

7   submitted on the 19th.

8          MS. CALVERT:  Okay.  Yes, yes.

9          THE COURT:  So the transcript May the 13th.  Defendant's

10  brief May the 10th -- I mean, June the 10th.  Government's brief

11  July the 8th.  Reply brief July the 19th.  And actually the reply

12  brief, that way if y'all have to fudge a few days, you know what

13  I'm saying, just as long as it gets to me on or about the 19th,

14  we're fine.

15         MS. PORTER:  Yes.

16         THE COURT:  Just talk amongst yourselves and let

17  Ms. Thornton know if you have shifted dates any.

18         Anything else to take up right now?

19         MS. PORTER:  No, your Honor.

20         MS. CALVERT:  I don't, no, your Honor.

21         THE COURT:  Thank you, ladies.

22         COURTROOM DEPUTY CLERK:  Court is adjourned.

23         (PROCEEDINGS REPORTED WERE CONCLUDED 10:24 A.M.)

24                _____

25

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES DISTRICT COURT

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6            I do hereby certify that the foregoing pages are a true

 7    and correct transcript of the proceedings taken down by me in the

 8    case aforesaid.

 9            This the 13th of May, 2019.

10

11

12

13

14

15

16    _____

17            PENNY PRITTY COUDRIET, RMR, CRR
               OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25
```