IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

EMANUEL GRAY,

      Defendant.

CASE NO. 1:18-CR-00487-SCJ-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is presently before the Court on Defendant Emanuel Gray's ("Defendant") Motion to Suppress Statements (the "Motion"). (Doc. 20). On April 29, 2019, Judge Janet F. King held a Jackson-Denno[1] hearing regarding the Motion. Defendant filed a post-hearing brief in support of the Motion, (Doc. 70), the Government filed its Response in Opposition to the Motion (Doc. 73), and Defendant filed his Reply. (Doc. 76). Although the undersigned did not preside over the hearing on the Motion, the parties agreed that another hearing was unnecessary and that the undersigned should issue this Report and Recommendation regarding the Motion based on the transcript, the evidence, and the parties' briefs. (Doc. 78). For the reasons outlined below, the Court **RECOMMENDS** that the Motion be **DENIED**. (Doc. 20).

---

[1] Jackson v. Denno, 378 U.S. 368 (1964)

## **BACKGROUND**

The operative indictment charges Defendant with both production of child pornography and attempted production of child pornography in violation of 18 U.S.C. § 2251(a), (e); two counts of cyber stalking in violation of 18 U.S.C. § 2261A; and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).  (Doc. 11).  In his Motion, Defendant seeks to suppress statements he made to Federal Bureau of Investigation ("FBI") special agents because: (1) he was not given Miranda[2] warnings before he made the statements; and (2) his statements were allegedly involuntary.  (Doc. 70, at 5).

On November 14, 2018, FBI Special Agent Megan Perry participated in the execution of a search warrant at an apartment in Decatur, Georgia.  (Doc. 35, at 4). About ten law enforcement officers, consisting of "a combination of agents, task force officers and local police department," participated in the search.  (Id. at 6).  As law enforcement was knocking on the door, a female was opening the door.  (Id. at 5).  The female was allowed to leave, and law enforcement "stood in the doorway and called for folks to come out of the house."  (Id.).  When no one did, law enforcement entered

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

the apartment. (<u>Id</u>.).

All of the law enforcement officers were armed, and the six agents at the front door of the apartment had their guns drawn. (<u>Id</u>. at 6–7). The officers cleared "out all the individuals from the house for everybody's safety [to] make sure there's no weapons or individuals in there that could cause harm to themselves or to [the officers]." (<u>Id</u>. at 6). The people still in the apartment were escorted outside and held in the hallway until law enforcement completed the protective sweep. (<u>Id</u>. at 5–6). The officers who stood with the individuals held outside the apartment holstered their weapons. (<u>Id</u>. at 7). Once the protective sweep was complete, the individuals were free to leave while law enforcement executed the search warrant. (<u>Id</u>. at 6). Special Agent Perry and Special Agent Keith Kabrhel approached Defendant and told him they "had some questions for him if he's willing to talk." (<u>Id</u>. at 7–8). Agent Perry explained that Defendant did not have to speak with law enforcement if he did not want to, but Defendant agreed to speak with the agents. (<u>Id</u>. at 8).

Defendant and the FBI agents went to an unmarked FBI vehicle to conduct the interview because it was raining. (<u>Id</u>. at 8–9). Kabrhel sat in the driver's seat, Perry was behind him, and Defendant was in the back passenger's side seat. (<u>Id</u>. at 9). The

3

agents were armed during the interview, but their firearms were holstered and not visible. (Id. at 10). The interview began at 8:04 AM and was recorded. (Id. at 9–11). A copy of the recording was introduced as Exhibit 1 during the hearing and has been reviewed by the undersigned. (Id. at 11). Within the first few minutes of the interview, Agent Perry reminded Defendant that he did not have to answer any questions and could choose not to answer at any time, that he was not under arrest, and that he was free to leave at any time. See (id. at 11–12). The agents did not give Defendant a Miranda warning because "he wasn't in custody." (Id. at 13).

At multiple points during the interview, the agents told Defendant he did not have to answer questions. When Defendant stated that he did not want to answer particular questions, the agents did not force him to. Approximately nineteen minutes into the interview, after questioning regarding Defendant's use of Facebook, Agent Perry told Defendant: "Sometimes when we ask you questions, we know some of the answers to them." Agent Kabrhel told Defendant:

> The FBI is different, we've done a lot of work before we came here, we know a lot about you. We're specialists in how the internet works and working through the internet and how apps and phones work. And so when . . . I ask you a question about other Facebooks you have, I know you're not telling me the truth. And I don't want you to do that, because that's being disrespectful to us, I think.

Defendant agreed that he would be honest and admitted to creating multiple Facebook accounts, stating that he thought he "made [the alternative account] for a bad reason." Defendant then claimed not to remember the name of his victim, and Agent Kabrhel said, "Saying 'I don't remember' is pretty much like lying when you do remember. You get that, right?" Agent Kabrhel called such behavior "disrespectful." A few minutes later, Defendant stated that he was "pretty sure" he only threatened the victim one time, and Agent Kabrhel said, "If you're gonna say . . . 'I don't remember' because you're trying to hide what you did, you're not trying to own up to it and be a man about it."

Around thirty-six minutes into the interview, when discussing the age of the victim, Defendant stated that he would "like if we could drive down the street a little farther, away from my family." Agent Perry told Defendant, "They can't hear you." The interview continued, Defendant took his jacket off, and Agent Kabrhel offered to turn the heat off if Defendant was hot. Toward the end of the interview, Defendant agreed to give the agents access to his phone and control over various online accounts. The interview concluded at 9:15 AM. (Doc. 35, at 15). Agent Perry testified that they used a "[c]alm" tone in speaking with Defendant and did not raise their

voices.  (Id. at 18).  Agent Perry also testified that Defendant was coherent, responsive, and not confused about what was going on.  (Id. at 18–19).  The recording of the interview supports those assertions.

After the interview, Defendant and the agents voluntarily returned to the apartment, and Defendant showed the agents how to find and unhide the images in a hidden gallery on his phone.  (Id.).  This conversation lasted "a minute or two" and was unrecorded.  (Id. at 16–17).  At this time, Defendant was free to leave the apartment but "couldn't freely move around within the apartment" because the search was still being conducted.  (Id. at 16).  Instead, Defendant had "to stay in the living room" and ask if he wanted to move around within the apartment.  (Id.).  At no point was Defendant placed in handcuffs or otherwise physically restrained.  (Id. at 8, 10, 17–18, 34).

## DEFENDANT'S MOTION TO SUPPRESS

### I.   Whether Defendant was entitled to a *Miranda* Warning

Defendant's argument that he was entitled to a Miranda warning turns on whether he "was in custody, because pre-custodial questioning does not require Miranda warnings."  United States v. Street, 472 F.3d 1298, 1309 (11th Cir.

2006).  This is "an objective test," involving two discrete inquiries.  Yarborough v. Alvarado, 541 U.S. 652, 653 (2004).  The Court examines "the circumstances surrounding the interrogation" and then decides, "given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave."  Id.; see also Thompson v. Keohane, 516 U.S. 99, 112 (1995).  This determination is made "under the totality of the circumstances."  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).  Because the test is objective, the subjective beliefs of the Defendant and the interviewing agents about whether Defendant was free to leave are irrelevant.  See Berkemer v. McCarty, 468 U.S. 420, 442 n.35 (1984).

In determining if a person is "in custody" within the meaning of the Fifth Amendment "the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'"  United States v. Phillips, 812 F.2d 1355, 1359 (11th Cir. 1987) (quoting Minnesota v. Murphy, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144, 79 L. Ed. 2d 409 (1984)).  As the Eleventh Circuit has repeatedly explained, "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been

7

'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes." United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (citing United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006)).

To determine if a person is "in custody," courts consider numerous factors such as whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Long, 866 F.2d 402, 405 (11th Cir.1989); see also Howes v. Fields, 565 U.S. 499, 515 (2012) (holding that the defendant was not "in custody" because, *inter alia*, he "was not physically restrained or threatened"). Another, "powerful factor in the mix" that "will generally lead to the conclusion that the defendant [was] *not* in custody" is whether he was unambiguously advised "that he is free to leave and is not in custody." Brown, 441 F.3d at 1347 (emphasis in original). While not determinative, in order to overcome this factor a defendant needs to show he was subject to "restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Id. (quoting United States v. Muegge, 225 F.3d 1267, 1271 (11th Cir. 2000)). These factors are, of course, a non-exhaustive list, but are sufficient for resolving the case at hand.

8

Considering the most important factor first, Defendant was repeatedly and unambiguously told that he was not under arrest, that he was free to leave, and that he did not have to answer any questions if he did not want to. See (Doc. 35, at 8, 11-12). The recording of the interview confirms Agent Perry's testimony on this point. Thus, Defendant must establish that he was subject to restraints "so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." Muegge, 225 F.3d at 1271. Defendant makes no such showing. First, Defendant notes that Agent Perry knew he "was the main target" at the time the search warrant was executed. (Doc. 70, at 7). But this fact is entitled to no weight because the "subjective beliefs of the . . . interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

Defendant next notes that he "was told to stand outside of his apartment where he was separated from his family and monitored by armed officers." (Doc. 70, at 7). The mere fact Defendant might have been "constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement"—does not mean, *ipso facto*, that he was "in 'custody' for

9

Fifth Amendment purposes." <u>Luna-Encinas</u>, 603 F.3d at 881.  The undisputed fact is that Defendant was being held so that law enforcement could conduct a protective sweep of the apartment and that *after* the sweep he was told he was free to leave and not speak with law enforcement.  (Doc. 35, at 6-8).

Defendant further notes that he "had no control over the vehicle" where he was questioned and that "the agents refused to move the vehicle at his request." (Doc. 70, at 7).  But a person is not "in custody" simply because he is questioned in an environment he does not control.  <u>See</u> <u>Howes</u>, 565 U.S. at 514-17 (holding that an inmate questioned in a prison conference room "was not taken into custody for purposes of <u>Miranda</u>").  The recording makes clear that the agents' "refusal" to move the vehicle placed no restraint on Defendant.  Notably, Defendant simply stated that he would "like" for the agents to move the vehicle "away from [his] family."  After Agent Perry assured Defendant, "They can't hear you," Defendant continued answering the agents' questions.  Defendant was, at all times, free to refuse to answer any question or to simply leave the vehicle.  <u>See</u> (Doc. 35, at 10-11).  The fact the agents did not drive the car wherever Defendant wanted them to does not mean he was "in custody."

Defendant also suggests "nothing on the *recording*" indicates he "was not

handcuffed while he was interviewed." (Doc. 70, at 7) (emphasis added).  The fact that the *recording* (which is audio only) does not indicate whether Defendant was in handcuffs does nothing to help Defendant's position because Agent Perry's consistent, unrebutted testimony was that Defendant was never placed in handcuffs, touched, or otherwise physically restrained.  (Doc. 35, at 8, 10, 17-18, 34).  The circumstances of this case are not the kind of "extensive" restraints on Defendant's freedom that he must show to demonstrate he was "in custody" after having been repeatedly told he was free to leave and that he did not need to answer any questions.  Muegge, 225 F.3d at 1271.

Defendant next discusses what occurred *after* he was interviewed, but it is unclear what if any subsequent statements he contends should be suppressed.  (Doc. 70, at 7-8).  After the interview, Defendant "showed [the agents] how to find [hidden] images" on his phone.  (Doc. 35, at 15).  To the extent there was any "discussion," it lasted only a minute or two and simply involved "going over the information that [Defendant] had already provided in the recorded interview."  (Id. at 16); see also (id. at 33-34).  Defendant had already told the agents how to find the pictures and voluntarily agreed to surrender the phone.  When a person has already voluntarily offered "incriminating information to the police, simple clarifying questions do not

necessarily constitute interrogation." United States v. Rommy, 506 F.3d 108, 133 (collecting cases).  Defendant points to no evidence he was asked anything other than clarifying questions during the brief discussion in the living room, and thus fails to show "he was interrogated," as he allges.  See (Doc. 70, at 7-8).

Even assuming the questioning in the apartment was the functional equivalent of interrogation for Miranda purposes, Defendant was still not in custody.  Defendant notes he "was not allowed to move around his residence freely," but that does not mean he was in custody.  (Doc. 70, at 8); see also Luna-Encinas, 603 F.3d at 881.  As Judge Steve C. Jones held under similar circumstances, law enforcement can "restrict the movement of persons during a search warrant to ensure officer safety and to prevent the possible destruction of evidence." United States v. Rhame, Case No. 1:16-cr-0067-SCJ, Doc. 295, at 17 (N.D. Ga. March 2, 2018).  This does not mean a person so restricted is "in custody." Id. Doc. 295, at 16–17 ("The fact that Mr. Rhame was not allowed to wander freely around the home **after** the interview is marginally relevant, at best. Even considering this, Mr. Rhame was not 'in custody.'") (emphasis in original).

The only other facts Defendant relies on are that he "was a 19-year old teen with

12

no criminal history" and was interviewed in the unfamiliar confines of an unmarked government vehicle. (Doc. 70, at 8); (Doc. 76, at 1-2). Defendant's lack of experience with law enforcement is the kind of subjective material that under applicable case law is "irrelevant" to the present inquiry. See Moya, 74 F.3d at 1119. Defendant's age presents a much closer question. The Supreme Court has indicated, in the context of an underage minor, that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." J.D.B. v. North Carolina, 564 U.S. 261, 277 (2011). That, however, does not necessarily mean a suspect's age is "even a significant[ ] factor." Id. Here, although Defendant was young, he more than a year past the age of majority.

Viewing the totality of the circumstances, the Court concludes that a reasonable person in Defendant's situation would have felt free to terminate the interrogation and leave. See Yarborough, 541 U.S. at 653; see also Thompson, 516 U.S. at 112. Defendant was repeatedly and unambiguously told "that he is free to leave and is not in custody." Brown, 441 F.3d at 1347. The agents did not brandish their weapons during the interview, touch Defendant, or use language or a tone that indicated that

compliance could be compelled (a factor that will be discussed more below).  See Long, 866 F.2d at 405.  Even taking into account Defendant's age, the environment in which he was questioned, and the minimal, temporary restraints on his movement while police searched the residence, he was not "in custody" until he was actually arrested, over an hour after the interview.  As such, Defendant was not entitled to a Miranda warning before any of the questioning at issue, and his statements are not due to be suppressed.

## II.   **Whether Defendant's Statements were Voluntary**

Defendant also argues his "statements were involuntary." (Doc. 70, at 11-12).  This inquiry focuses not on whether the Defendant was subject to custodial interrogation, but rather on whether "the circumstances show that 'coercive police activity' overcame the defendant's free will."  Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 904 (11th Cir. 2017) (quoting Colorado v. Connelly, 479 U.S. 157, 163–64 (1986)); see also Jarrell v. Balkcom, 735 F.2d 1242, 1252 (11th Cir. 1984) ("[E]ven if a court finds compliance with Miranda, the court must still rule on the confession's voluntariness.").  But the fact that a person was not in custody when the incriminating statements were made is an indication that the statements were voluntary.  See J.D.B., 564 U.S. at 268–69 ("Only those interrogations that occur while a suspect is in police

14

custody, however, 'heighte[n] the risk' that statements obtained are not the product of the suspect's free choice.") (quoting <u>Dickerson v. United States</u>, 530 U.S. 428, 435 (2000)) (alteration in original).  "Voluntariness is determined by an assessment of the totality of the circumstances, but that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." <u>Miller v. Dugger</u>, 838 F.2d 1530, 1536 (11th Cir. 1988).  "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." <u>United States v. Lall</u>, 607 F.3d 1277, 1285 (11th Cir. 2010).

"Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." <u>Miller</u>, 838 F.2d at 1536.  None of those circumstances are present here.  The interview in the car lasted approximately an hour and ten minutes and the "discussion" in the living room lasted only "a minute or two," neither of which are the kinds of exhaustingly long interrogations that might render a confession involuntary.  (Doc. 35, at 9-11, 15-17); <u>see also</u> <u>Mincey v. Arizona</u>, 437 U.S. 385, 398–401 (1978) (holding a confession was involuntary where the

hospitalized defendant was interrogated for four hours, even though he repeatedly asked the officer to stop until he could get a lawyer).   Here, no one used or threatened to use any force against Defendant that might have rendered his confession involuntary.  See (id. at 8, 10, 17-18, 34); see also Beecher v. Alabama, 389 U.S. 35, 36–37 (1967) (holding a confession obtained after the defendant was shot in the leg was involuntary because one of the officers threatened to kill the defendant and the other officer fired a rifle next to the defendant's ear).  And no one made any other threats or promises to Defendant.  (Id. at 8, 17).

Defendant also contends that his statements were involuntary because Agent Kabrhel admonished him.  Specifically, Agent Kabrhel told Defendant that he was "being disrespectful or not owning up to what he did" by lying.  (Doc. 70, at 11–12).  But binding precedent holds that "a mere admonition to the accused to tell the truth does not render a confession involuntary." United States v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983), holding modified on other grounds by United States v. Toler, 144 F.3d 1423 (11th Cir. 1998).  While Agent Kabrhel stated that lying was "disrespectful or not owning up," no promises of leniency or clemency were made to Defendant to induce him to tell the truth.  Cf. United States v. Chemaly, 741 F.2d 1346,

16

1352 (11th Cir. 1984) (holding that telling a suspect "'honesty wouldn't hurt him' contradicted the <u>Miranda</u> warning that anything he said could be used against him in court").

Defendant also notes that Agent Kabrhel told him that the FBI were "specialists" and that they knew "a lot" about him. (Doc. 70, at 11). Defendant, however, cites no authority indicating such a statement could render his confession involuntary. There is no evidence Agent Kabrhel lied to Defendant or misled him by stating that the agents were "specialists" who know "a lot" about Defendant. Even if Agent Kabrhel's statements were untruthful, that alone would not render Defendant's confession involuntary. <u>See, e.g.,</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (holding that falsely telling a suspect his cousin had implicated him was "relevant," but "insufficient . . . to make this otherwise voluntary confession inadmissible").

Last, Defendant suggests that "the circumstances" of the interviews and his "age and lack of experience with law enforcement" indicate that his statements were involuntary. (Doc. 70, at 11-12). While Defendant was young, he was also an adult at the time of the interview. Although Defendant lacked experience with law enforcement, he was repeatedly advised that he was not under arrest, was free to leave,

17

and did not have to answer any questions if he did not want to.  When Defendant indicated he did not want to answer particular questions, the agents did not force him to answer or otherwise suggest they could compel his answers.  And nothing about "the circumstances" of Defendant's interview in the car or his living room indicate his confession was involuntary for the reasons already given above.

Looking at the totality of the circumstances, the Court concludes that the Government met its burden of establishing that Defendant's confession was voluntary and not the product of official overreaching.  See, e.g., Arvelo, 687 F. App'x at 904 (holding the twenty-one year old defendant's confession was voluntary even though he was under arrest and interrogated for three hours because the officers did not physically coerce the defendant, deprive him of any essential needs, or threaten him in any way and the defendant did not "ever say he was tired or unwilling or unable to proceed").  As such, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**.  (Doc. 20).

## **CONCLUSION**

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**.  (Doc. 20).  There are no other pending

matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

    **SO ORDERED, REPORTED, AND RECOMMENDED**, this  21  day of July, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE